Darcy **FOSTER, et al., Plaintiffs,**

v.

**MYDAS ASSOCIATES, INC.,**
**et al., Defendants.**

**Civ. A. No. 88–0769–H.**

United States District Court,
D. Massachusetts.

Dec. 12, 1991.

**615**

Molly Cochran, Bingham, Dana & Gould, Nadine Cohen, Lawyers' Committee for Civil Rights, Boston, Mass., for plaintiffs.

Geoffrey A. Domenico and Patricia C. Whalen, Brockton, Mass., for defendants.

## MEMORANDUM AND ORDER

HARRINGTON, District Judge.

### I. BACKGROUND

This action originated with a claim by the Plaintiffs Darcy Foster, a black native of Barbados, his wife Marjorie, a white native of Canada, and their minor son, Terry, that they were the victims of racial discrimination at the hands of the Defendants Mydas Associates, Inc. (the realtor listing the property), Robert McKean (the owner of the property), Richard Sena (McKean's business partner) and Jeffery Chabot (the real estate agent), in connection with their efforts to purchase a dilapidated piece of property in a racially-mixed, "run-down" neighborhood in Brockton, Massachusetts. At the time the property was used by "street people" for shelter. The plaintiffs had sought to purchase the property for the purpose of rehabilitating and reselling it.

The case proceeded to trial, which lasted for four days. The Defendants' Motion for a Directed Verdict[1] was denied and the case went to the jury on three counts.[2] The jury returned a verdict for the defendants on all three counts within an hour. This Court likewise found for the defendants on the state consumer protection

---

**1.** This Court did, however, direct a verdict for the Defendant Sena, finding that the plaintiffs had not produced "one bit of evidence" against him.

**2.** The Second Amended Complaint contained six counts. Count 1 alleged violations of the Federal Fair Housing Act, 42 U.S.C. §§ 3604(a) and 3617; Count 2 alleged violations of 42 U.S.C. § 1981; Count 3 alleged violations of the Massachusetts Anti–Discrimination statute, Mass.

Gen.L. ch. 151B, § 4; Count 4 alleged violations of the Massachusetts Civil Rights statute, Mass. Gen.L. ch. 12, §§ 11H and 11I; and Counts 5 and 6 alleged violations of the Massachusetts Consumer Protection statute, Mass.Gen.L. ch. 93A, §§ 9 and 11. Count 4 was withdrawn by the plaintiffs before trial. Pursuant to the statute, Counts 5 and 6 were reserved for consideration by this Court.

counts. No appeal was taken by the plaintiffs from these judgments.

Shortly thereafter, the defendants moved for attorneys' fees and costs. This Court entered an order on the papers allowing the defendants' application for costs and fees in the amount of $26,000.[3] The plaintiffs appealed the granting of this award. Claiming that it was unable to properly review this matter based on the record before it, the First Circuit Court of Appeals remanded the matter to this Court to ascertain the basis of this Court's ruling. *Foster v. Mydas Associates, Inc.*, 943 F.2d 139, 140 (1st Cir.1991).

Pursuant to the Circuit Court's remand, this Court has held two separate hearings on this matter. After carefully weighing and considering the parties' oral arguments, filings and the case record, this Court reaffirms its previous decision to award attorneys fees, costs, and expenses to the defendants. This is ordered pursuant to the fee-shifting provisions of 42 U.S.C. § 1988.[4]

## II. DISCUSSION

■ It is well-settled that a plaintiff may be liable for attorney's fees under Section 1988 when the court "finds that his claim was frivolous, unreasonable, or groundless, or *that the plaintiff continued to litigate after it clearly becomes so.*" *Hughes v. Rowe*, 449 U.S. 5, 15, 101 S.Ct. 173, 178, 66 L.Ed.2d 163 (1980), *quoting Christiansberg Garment Co. v. E.E.O.C.*, 434 U.S. 412, 422, 98 S.Ct. 694, 700, 54 L.Ed.2d 648 (1978) (emphasis supplied). This particular case, while it may have been properly filed, clearly became groundless as discovery progressed and plaintiffs and their counsel should have been aware of that fact. In so determining, this Court is well aware of the Supreme Court's cautionary warning that a district court must resist the urge to engage in "post hoc reasoning" and the use of "hindsight logic" in concluding that a suit is groundless because the plaintiff ultimately does not prevail. *Christiansberg Garment Co. v. E.E.O.C.*, 434 U.S. at 422, 98 S.Ct. at 700. Throughout the course of this case, however, this Court has made no secret of how it viewed the merits of the plaintiffs' claims such that neither party can seriously claim that this Court is engaging in hindsight logic.

It is undisputed that the plaintiffs established a *prima facie* case. The Plaintiff Darcy Foster was a member of a racial minority who sought to, and was qualified to, purchase the property in question. His offer was rejected by the seller and the property remained for sale. *See Robinson v. 12 Lofts Realty, Inc.*, 610 F.2d 1032, 1038 (2d Cir.1979).

Specifically, Plaintiff Foster made an offer of the full asking price of $79,900. He was then contacted directly by the owner of the property, Defendant McKean. McKean was engaged in the business of purchasing property for rental or resale. McKean asked Foster if he would pay an additional $3,000 to cover the cost of a new heating system that needed to be installed immediately. Foster agreed. McKean then informed Foster that he required a thirty day closing and that if Foster could not close within thirty days he (Foster) would have to pay the carrying charges until closing. Foster stated that he did not feel that he could close within thirty days, but he absolutely refused to pay the carrying charges. As a result, the deal collapsed. As of the date of the trial, the property remained unsold.

As was their burden, the defendants proffered several nondiscriminatory reasons why they did not sell the property to the plaintiffs. *See Asbury v. Brougham*, 866 F.2d 1276, 1281 (10th Cir.1989). In essence, the defendants asserted that this was nothing more than a real estate deal gone bad because the Plaintiff Darcy Foster refused to meet McKean's terms. The defendants further asserted that the terms

---

**3.** The actual order read as follows: "Application allowed. Court awards $26,000 in fees, costs, and expenses."

**4.** This Court notes, nonetheless, that sanctions, pursuant to Fed.R.Civ.P. 11, also would be appropriate in this case. Although warranted, this Court declines to impose such sanctions.

sought by McKean were reasonable and justified given the dilapidated nature of the property, its need for immediate repairs and the difficulties that would be encountered in arranging financing for such property.

At this point the burden shifted back to the plaintiffs to establish that the defendants' proffered reasons were but a pretext. *See Phillips v. Hunter Trails Community Ass'n,* 685 F.2d 184, 190 (7th Cir. 1982). Key to the plaintiffs' efforts in this regard was the information obtained from a so-called "white tester," that had been dispatched in connection with a M.C.A.D. (Massachusetts Commission Against Discrimination) investigation conducted prior to the filing of this suit. According to the affidavit filed by the white tester, he was never told that he would have to close in only thirty days. *Affidavit of Kevin W. Marlatt,* at ¶ 11B ("Marlatt Aff.")[5]. The plaintiffs believed that the thirty day closing term was added by McKean to discourage Foster from purchasing the property on account of Foster's race. It was their belief that the white tester's information confirmed this theory.

Yet, in the paragraph immediately preceding the one in which the white tester said he was never told of the thirty day closing, he stated that the Defendant Chabot told him that, in regard to the one other offer made on the property, i.e. Foster's, "the owner wanted to close in thirty days but the offeror [Foster] was unable to do that." *Marlatt Aff.* at ¶ 11A. Knowing that their white tester had been given this information, it is somewhat disingenuous for the plaintiffs to assert that, because the tester was not explicitly told that he too would have to close within thirty days, he therefore would be exempted from this requirement simply because he was white. Indeed, it would appear that the white test-

er never *asked* whether he too would have to close in thirty days. Thus, in regard to this crucial issue the affidavit is ambiguous on its face.

Nonetheless, the information contained in the Marlatt Affidavit was the plaintiffs' strongest piece of "hard" evidence that the defendants' actions toward Foster were racially discriminatory. Despite this fact, the plaintiffs never called Marlatt to testify at trial. Such testimony could have greatly added to the plaintiffs' case and would have, at least, clarified the facial ambiguity of Marlatt's Affidavit. This Court finds the plaintiffs' failure to call such a vital witness incomprehensible and further evidence of the groundless nature of this suit.[6]

Additionally, at the time of the Preliminary Injunction hearing in June, 1988, the defendants submitted to the plaintiffs three affidavits submitted by prospective purchasers, both black and white[7], of the property. While the affidavits were each identical and somewhat boilerplate, they nonetheless stated that these individuals were shown the property at approximately the same time as the Plaintiff Darcy Foster and that they too were informed of the thirty day closing requirement. They went on to say that such a requirement is not unusual when dealing with investment property in this poor condition.

These affidavits, brief though they were, flatly contradicted the plaintiffs' assertion that these terms were simply tacked on by McKean to deter Foster from purchasing the property due to his race. Despite this fact, the plaintiffs took no action to depose the individual affiants or otherwise impugn or even investigate the veracity of this information until the evenings of October 26th and October 29th, *1990,* at which time plaintiffs' counsel telephoned Affiants Poku and Owens, respectively.[8]

---

**5.** The Marlatt affidavit contains two consecutive paragraphs numbered "11." For the sake of clarity, they will be referred to as "¶ 11A" and "¶ 11B," respectively.

**6.** In fact, at trial plaintiffs never even utilized the *information* contained in Marlatt's Affidavit for the purposes of cross-examination of Defendant Chabot.

**7.** While the affidavits themselves were silent regarding the race of the individual affiant, the defendants made oral representations of that fact to plaintiffs' counsel.

**8.** The trial was held from November 12 to November 16, 1990.

Subsequently, all three affiants testified at trial, where they were subject to vigorous cross-examination by plaintiffs' counsel. All three of them proved to be extremely effective witnesses for the defendants and their testimony severely undermined the plaintiffs' pretext claims. Given the facts that the information contained in these affidavits went to the heart of the plaintiffs' pretext claims and that all three affiants proved to be such effective witnesses for the defendants, this Court considers the plaintiffs' half-hearted, eleventh hour "effort" to investigate their claims inexcusable.

At oral argument on the matter of awarding costs, the plaintiffs defended their failure to investigate the affidavits by claiming they believed that, due to their identical wording and lack of specifics, the affidavits were mere fabrications. Such an argument is totally devoid of merit. Parties cannot choose to disregard information simply because it does not fit their view of the facts. Parties are obligated to investigate *all* facts which come to light not simply those which benefit their case. Indeed, a belief that the defendants had given false information should give the plaintiffs all the more reason to investigate in the hope of exposing the defendants' deception.[9]

As further support of their claim that the defendants' proffered reasons were pretextual the plaintiffs asserted that the inferences to be drawn from the defendants' conduct led to a conclusion of racial discrimination. *See Furnco Construction Corp. v. Waters,* 438 U.S. 567, 577, 98 S.Ct. 2943, 2949, 57 L.Ed.2d 957 (1978). Specifically, the plaintiffs argued to this Court that the defendants' refusal to sell the property after the plaintiffs offered the full asking price was economically irrational. Therefore, the plaintiffs argued, the

rational inference to be drawn from the defendants' action was that they were motivated, at least in part, by racial discrimination.

While the plaintiffs may have been justified in drawing this inference at the outset of this action, they made no effort to obtain any outside opinion to substantiate it. The plaintiffs consulted no experts to determine whether it was unusual or unwarranted for the seller to require a thirty day closing term or, in the alternative, to require that the purchaser pay the carrying costs, when dealing with a dilapidated piece of property located in a "run down" area. *Cf. Smith v. Smythe–Cramer Co.,* 754 F.2d 180, 186 (6th Cir.1985) ("Plaintiffs' belief that these departures from ordinary practice were due to their race was based on the advice of professionals familiar with real estate practice.")

Nonetheless, throughout two days of oral arguments on the matter of awarding costs, plaintiffs continued to represent to this Court that the sheer illogic of the defendants' passing up a $40,000 profit and halting further negotiations because the plaintiffs refused to pay carrying costs led them to a logical and inevitable conclusion that the plaintiffs were the victims of racial discrimination. This Court never has been of the opinion that this conclusion is as compelling as the plaintiffs suggest, even when viewed from their perspective at the time of filing. The house had only been on the market for three weeks before McKean received a full price offer on it. Given that fact, it certainly would not have been irrational for McKean at that time to hold out, thinking someone else would fully meet his terms. If, in fact, market forces were such that McKean's decision not to sell *at that time* was irrational, the plaintiffs produced

---

**9.** At the time of the Preliminary Injunction hearing at which the above-mentioned affidavits were introduced, the defendants also proffered information to the plaintiffs that a very large percentage of Defendant McKean's rentals and sales in the Brockton area had been to minorities. While such information is not dispositive in proving that no discrimination occurred, *it is,* nonetheless, relevant to rebutting such a claim and should have further alerted the plaintiffs to

the hollowness of their claim. *See Furnco Construction Co. v. Waters,* 438 U.S. 567, 580, 98 S.Ct. 2943, 2951, 57 L.Ed.2d 957 (1978); *Asbury v. Brougham,* 866 F.2d 1276, 1282 (10th Cir. 1989); *cf. Blue v. U.S. Dept. of the Army,* 914 F.2d 525, 543 n. 1 (4th Cir.1990) (Rule 11 sanctions justified against plaintiffs' counsel due, among other reasons, *to plaintiffs' failure to* present any statistical evidence of racial discrimination).

no evidence in that regard at any time during the course of this action.

This Court is well aware that plaintiffs in a discrimination case often are forced to rely more on circumstantial, than on "hard," evidence. *Foster v. Mydas Associates, Inc.,* 943 F.2d at 145. In this case, however, where the circumstances were ambiguous in determining whether discrimination actually occurred, it was incumbent upon the plaintiffs to do more than simply insist that from their perspective, the facts justified their bringing, *and maintaining,* this action. The plaintiffs failed to consult experts in the field to determine, for example, whether the terms imposed by McKean were common in dealing with this type of property or whether market forces in Brockton in late 1987 were such that McKean had reasonable hope of finding a buyer to meet his terms. What may seem irrational and unfair to one not familiar with the practices of a given field, may make perfect sense to one familiar with its workings. In other words, when the facts lend themselves to varying, yet plausible, interpretations, the plaintiffs need other opinions besides their own.[10]

This Court concludes that, during the course of these proceedings, the plaintiffs should have realized that their action was frivolous, unreasonable and without foundation. While the plaintiffs established a *prima facie* case, they made little or no effort to meet their burden of establishing that the defendants' proffered reasons for their actions were a pretext. Indeed, when presented with evidence that flatly contradicted their claim of pretext, the plaintiffs chose to ignore it. To continue to press a suit forward with almost no effort to establish its merits, is wholly unreasonable and renders such an action frivolous.

■ Nonetheless, plaintiffs assert that, because they established a *prima facie* case and survived defendants' Motion

for a Directed Verdict, an award of fees is inappropriate. While that may be true in some circumstances, this is not such a case. Of necessity, the threshold for establishing a *prima facie* case of racial discrimination is low. *See Robinson v. 12 Lofts Realty, Inc.,* 610 F.2d at 1038. Such a threshold acknowledges the difficulty faced by prospective plaintiffs in bringing such an action. Because the burden of proving his case ultimately falls to the plaintiff, his ability to establish a *prima facie* case will not, in and of itself, render sanctions inappropriate. *See, e.g., Blue v. U.S. Dept. of the Army,* 914 F.2d 525, 536 (4th Cir.1990); *Introcaso v. Cunningham,* 857 F.2d 965, 967–968 (4th Cir.1988). In language which can appropriately be applied to the facts of this case, the Fourth Circuit observed, "[L]itigants and their counsel are not free, simply because they can meet the requirements of a *prima facie* case, to disregard evidence that comes to light in discovery and to continue to press their case without any reasonable belief that plaintiffs actually were the victims of racial discrimination." *Blue v. U.S. Dept. of the Army,* 914 F.2d at 537. This Court agrees with the Fourth Circuit's analysis.

■ Similarly, the fact that the plaintiffs survived a Motion for a Directed Verdict does not insulate them from the imposition of a fee award based on the frivolousness of their claim. *Brown v. Borough of Chambersburg,* 903 F.2d 274, 279 (3d Cir. 1990); *see also Foster v. Mydas,* 943 F.2d at 144. In declining to grant the defendants' Motion for a Directed Verdict, this Court was merely acknowledging the fact that, because the plaintiffs had established a *prima facie* case against which the defendants offered legitimate reasons, this was a question of fact for the jury.[11] It was not meant to be an evaluation of the evidence, which at the time, this Court found to be practically nonexistent. *See*

---

**10.** This Court does not mean to suggest that only experts can establish the veracity of a civil rights claim. It means only that plaintiffs bring forth *some* type of evidence, e.g., statistics, affidavits to corroborate their interpretation of events. *See, e.g., Asbury v. Brougham,* 866 F.2d

at 1281 (Plaintiffs offered evidence of exceptions to defendants' rental policy being made for white tenants).

**11.** This Court did, in fact, direct a verdict for the Defendant Sena. *See* note 1, *supra.*

**620**

*Brown v. Borough of Chambersburg*, 903 F.2d at 279, 280.

Thus, for the reasons outlined above, this Court has determined that the defendants should be awarded costs and fees pursuant to 42 U.S.C. § 1988. This Court is well aware of the gravity and the severity of such an action in the context of a civil rights case. It is not a decision that this Court has undertaken lightly. Yet, ultimately the fact that this case involves a suit to redress alleged deprivations of constitutional rights cannot be determinative. The standards of Section 1988 must apply equally to all civil suits. For it is equal enforcement of the law alone that inspires the respect and confidence of the public and is the keystone of a just legal system. To charge racial discrimination is to accuse a person of a most despicable and disreputable act. Thus, one who seeks to secure his own civil rights must, in turn, be equally sensitive to the rights of the innocent to preserve their "good name" and not, without sufficient legal basis, "rob [them] of that which not enriches him [but] makes [them] poor indeed."

The defendants have submitted a detailed list of bills and costs, the accuracy and amount of which is not challenged by the plaintiffs.[12] Therefore, it will be adopted by this Court for purposes of assessing the fee award.

■ For the purposes of computing this award, this Court considers the date of the Preliminary Injunction hearing, June 6, 1988, to be critical, for it is at this time that the plaintiffs were presented with the affidavits which directly contradicted the plaintiffs' pretext argument. From this point forward, the plaintiffs were on notice that their claims were groundless. Thus, all costs incurred prior to June 6, 1988 will be disallowed. This Court will allow defendants' fees and costs in the amount of thirty-one thousand, four hundred eleven dollars and forty-eight cents ($31,411.48), which represents the period from June 7,

1988 through the last day of trial, November 16, 1990.

In order not to penalize the plaintiffs for exercising their right to appeal, the Court, pursuant to the discretionary authority granted it under Section 1988, reduces the amount of the award by 20 percent.

Therefore, for the reasons stated above, it is hereby ORDERED that the plaintiffs pay the fees, costs, and expenses incurred by the defendants in the amount of Twenty–Five Thousand, One Hundred Twenty–Nine Dollars and Eighteen Cents ($25,129.18).

SO ORDERED.

---

**12.** As a result this Court declines to disallow certain expenses, as was done in its original

action on this Motion.